UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
ALEXIS GRUYAIR,                    :   11 Civ. 0048 (DAB) (JCF)
                                   :
          Petitioner,              :      REPORT AND
                                   :   RECOMMENDATION
     - against -                   :
                                   :
WILLIAM LEE,                       :
                                   :
          Respondent.              :
- - - - - - - - - - - - - - - - - -:
TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:

     Alexis Gruyair, proceeding pro se, brings this petition for a
writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his
conviction in New York State Supreme Court, New York County, for
attempted murder in the second degree and assault in the first
degree.  Mr. Gruyair challenges his conviction on the grounds that:
(1) the trial judge's failure to alert defense counsel of a jury
note and to respond to the note violated his constitutional rights;
(2) the trial judge's failure to respond to the jury note at issue
violated his constitutional rights; (3) he was denied effective
assistance of counsel by his trial counsel's failure to obtain
expert analysis and technical enhancement of security camera
footage instrumental to his defense; and (4) the judge's failure to
show the jury note at issue to the defense rendered his counsel

1

incapable of providing effective assistance effective assistance.[1] For the reasons set forth below, I recommend that the petition be denied.

<u>Background</u>

A.   <u>The Crime</u>

On April 8, 2004, a man wearing a black hooded sweatshirt shot Omar Holmes multiple times at El Rancho Jubilee ("Jubilee"), a Manhattan restaurant and nightclub. (Respondent's Memorandum of Law in Support of Answer Opposing Petition for a Writ of Habeas Corpus ("Resp. Memo.") at 2). Eyewitnesses, including Mr. Holmes, later identified Mr. Gruyair, who was at Jubilee that night, as the shooter. (Resp. Memo at 2; Tr. at 169, 281-82).[2]   Police arrested the petitioner at a hotel in Newark, New Jersey on April 13, 2004. (Tr. at 487-89).

On April 26, 2004, the petitioner was charged by a grand jury with attempted murder in the second degree and assault in the first degree. (Resp. Memo. at 2-3).   He pled not guilty to these charges. (People's Response to Defendant's Motion Pursuant to Criminal Procedure Law 330.30(3) ("330 Response"), attached as Exh. E to Answer Opposing Petition for a Writ of Habeas Corpus

---

[1] Although this is not the most logical sequence in which to lay out the petitioner's claims, it is the sequence used by Mr. Gruyair in his petition and followed in the respondent's answer.

[2] "Tr." refers to the trial transcript.

("Answer"), at 6).  On January 18, 2005 Justice William Wetzel of the New York State Supreme Court, New York County, denied Mr. Gruyair's suppression motions, and the case proceeded to trial two days later. (330 Response at 6; Resp. Memo. at 3).

> B.  <u>The Prosecution's Case at Trial</u>

At trial, the prosecution introduced testimony that Mr. Gruyair and Mr. Holmes met in 1999 at the home of Mr. Holmes' friend Kelvin.[3]  (Tr. at 156).  Sometime between that meeting and the shooting at Jubilee, Kelvin informed Mr. Holmes that he owed the petitioner money.   (Tr. at 156-57).  Sometime thereafter, Kelvin shot the petitioner and was arrested.   (Tr. at 157-58). Following the shooting, in November 2003, the petitioner offered Jennifer Rosado, a mutual friend of both Mr. Holmes and himself, $10,000 tell him where he could find Mr. Holmes in order to "set him up." (Tr. at 264-67).  She declined.  (Tr. at 267).

On April 8, 2004, Mr. Holmes made plans with his girlfriend Jackie Sanchez, and her friend Lorraine Castillo, to meet at Jubilee.  (Tr. at 161-63, 401).  Ms. Castillo arrived at about 11 p.m. and went to the "VIP booth," a section of the main room separated by a raised booth that contained a table, chairs, and a love seat.  (Tr. at 402-04).  Customers in the VIP booth were

---

[3] The record does not indicate Kelvin's last name.

visible to those in the adjacent section of Jubilee.  (Resp. Memo. at 6) (citing Exhibits 8G-8H, photographs depicting the VIP booth). Ms. Sanchez arrived soon after with a friend.  (Tr. at 438-39). Another friend, Luisa Tavares joined them around 11:30 p.m.  (Tr. at 278, 290-91).  At approximately midnight, Mr. Gruyair also arrived at Jubilee.  (Footage from Jubilee's security cameras ("Footage"), attached as Exh. R to Answer; Resp. Memo. at 7). He and several other individuals sat at a table in the back of the restaurant.  (Footage; Resp. Memo. at 7, 8).  Mr. Holmes arrived at Jubilee at approximately 12:30 a.m. and joined his friends in the VIP section.  (Tr. at 163-64, 238).

At 1:06 a.m., Mr. Gruyair left his table and exited Jubilee through a side door.  (Footage; Resp. Memo. at 8).  Twelve minutes later he reentered Jubilee, now accompanied by another man. (Footage; Resp. Memo. at 8).  Both were wearing black hooded sweatshirts.  (Footage; Resp. Memo. at 8).  The sweatshirt of one of the men -- according to the prosecution it was Mr. Gruyair -- had a white logo or lettering across the front.  (Footage; Resp. Memo. at 8, Tr. at 601-02). The petitioner returned alone to the table he had occupied earlier.  (Footage; Resp. Memo. at 8).

When Mr. Gruyair reached his table, he pushed back his hood, handed a black jacket to one of the men at the table, said something to all four men sitting around it, and pulled his hood

4

back up.  (Footage; Resp. Memo. at 8).  The four men got up and left the table.  (Footage; Resp. Memo. at 8).  The petitioner left his jacket on the chair and walked toward the VIP booth.  (Footage; Resp. Memo. at 8).

Mr. Holmes was sitting in the VIP booth, with Ms. Sanchez on his lap.  (Tr. at 166-67).  Her back was to the entrance of the booth.  (Tr. at 452).  Ms. Tavares was standing outside the booth, talking to a friend when a man wearing a black hooded sweatshirt pushed past them and entered the booth.  (Tr. at 281-82, 306, 309-10, 317).  Ms. Tavares saw the man's face and recognized him as Mr. Gruyair.  (Tr. at 281-82).  The man approached Mr. Holmes, spoke to him in Spanish, and shot him in the left shoulder. (Tr. at 168-70).  Mr. Holmes was able to see the man's face and identify him at Mr. Gruyair immediately after being shot. (Tr. at 169).  Mr. Holmes pushed Ms. Sanchez off his lap and stood up, but the petitioner shot him again.  (Tr. at 170-71, 247, 283, 311, 443).  Mr. Holmes attempted to struggle with the petitioner, but was shot in the chest again and fell to the ground.  (Tr. 171-73, 247-48, 251-52, 257).  Mr. Gruyair then shot Mr. Holmes in the back.  (Tr. 173, 251-52, 257).  According to Ms. Tavares, who was trapped under Mr. Holmes when he fell, the petitioner shot Mr. Holmes twice more and then ran toward the back of the restaurant. (Tr. at 284, 306, 312-15).

In the immediate aftermath of the shooting, the video camera outside Jubilee's side door recorded a man in a black hooded sweatshirt fleeing the restaurant, followed by a crowd of people running out the door. (Footage; Resp. Memo. at 10). A few seconds later, another man in a black hooded sweatshirt with a white logo -- agreed by both parties to be the shooter and identified by the prosecution as Mr. Gruyair -- exited Jubilee through the same side door. (Footage; Resp. Memo. at 10). As he did so, he tucked what appeared to be a gun into his waistband. (Footage; Resp. Memo. at 10-11).

C.   The Defense Case

David Goldstein, the petitioner's counsel at trial, elected not to call any witnesses. (Affirmation of Kerren Misulovin in Support of the Petitioner's Motion to Set Aside Verdict dated May 28, 2008 ("440 Aff."), attached as Exh. F to Answer, ¶ 16). Instead, Mr. Goldstein's strategy focused on impeaching the prosecution's witnesses and arguing, based on the security camera footage, that the man shown exiting Jubilee after the shooting was not in fact Mr. Gruyair. (Decision dated Dec. 22, 2008 ("440 Denial"), attached as Exh. I to Answer, at 7-8).

With regard to the security camera footage, Mr. Goldstein stated in his opening that:

[O]n April 8, 2004, two people entered [Jubilee], both of

6

> them wearing hooded sweatshirts, both of them were
> wearing sweatshirts with a label with writing on them.
> One of them was wearing a hat. . . . You will see him go
> in the direction of where Omar Holmes is seated with
> these girls.  You will see after the shooting this same
> individual wearing a hat, not a hoody, leave the club by
> the side entrance hiding a gun in his waistband.  You
> will see that this individual is not Alexis
> Gruyair . . . .

(Tr. at 26).  Similarly, in summation, he argued that:

> After the shooting, within five seconds . . . the same
> guy comes out with the hat, with the white around his
> neck, sticking something into his waistband, which you
> could certainly conclude was the gun that he used to
> shoot Omar Holmes. . . . [B]ut you will see that the only
> evidence consistent with who is the shooter in this case
> is that man with that hat with the label, and that is not
> Alex Gruyair.

(Tr. at 568-69).  Mr. Goldstein did not obtain expert analysis or

enhancement of the footage in preparation for trial. (440 Aff., ¶¶

37-39).   However, he successfully elicited from Mr. Holmes

testimony that Mr. Gruyair had no motive to shoot him.  (Tr. at

210).  He further attacked Mr. Holmes' in-court identification of

Mr. Gruyair by confronting him with multiple instances, both in the

immediate aftermath of the shooting and the next day, in which Mr.

Holmes stated that he could not identify the shooter.  (Tr. 231-

34).  Similarly, under cross-examination, Mr. Goldstein obtained

testimony from Ms. Tavares that when questioned by police soon

after the shooting she had not provided them with the shooter's

name.  (Tr. at 285).   He also impeached her claim to have

identified Mr. Gruyair as the shooter to a detective the following day by introducing the detective's handwritten notes of the conversation, which did not include Mr. Gruyair's name. (440 Aff., ¶ 23).

D.   <u>Jury Deliberations and Verdict</u>

The jury's deliberations lasted from January 26 to January 28, 2005. (Resp. Memo. at 25-26). Over the course of those three days, the jurors returned numerous notes to Justice Wetzel, asking for exhibits, for testimony to be read back, for further legal instructions, for a VCR with pause function, and for a clearer version of the security camera footage; they also requested an adjournment on the afternoon of January 27. (Jury Notes I-VIII, attached as Exh. B to Answer; Resp. Memo. at 25). The ninth note, labeled Court Exhibit IX ("Jury Note IX"), was sent to Justice Wetzel on January 28. It has the word "confidential" written at the top and states: "We the jury request clarification on what happens after the verdict is read. We would like to be escorted out [and] be able to leave the building without having contact with any observers in this court." (Jury Note IX, attached as Exh. B to Answer).

The judge did not address the jury in response to Jury Note IX, nor did he inform either party of its existence. (Resp. Memo. at 26). Just over half an hour later, the jury sent a note stating

that it had reached a verdict.  (Jury Note X, attached as Exh. B to
Answer).  Prior to bringing the jury in, Justice Wetzel admonished
the courtroom audience that "whatever the verdict is, out of
respect for those people, I would ask that you just stay silent."
(Tr. at 651).  He next brought the jury in and the foreperson
announced that they found Mr. Gruyair guilty of attempted second-
degree murder and first-degree assault.  (Tr. at 652-54).
Following the reading of the verdict, Justice Wetzel asked the
jurors to "step back into the jury room" (Tr. at 654), after which
they were then escorted out of the building. <u>People v. Gruyair</u>, 75
A.D.3d 401, 401, 904 N.Y.S.2d 48, 48 (1st Dep't) (2010).

    E.   <u>Subsequent Proceedings</u>

    Following trial, Mr. Goldstein obtained an expert forensic
analysis and technical enhancement of Jubilee's security camera
footage.  (Affirmation of David Goldstein in Support of the
Petitioner's Motion for a New Trial dated April 8, 2005 ("330
Affirmation"), attached as Exh. D to Answer, ¶ 4).  Relying on that
information, Mr. Goldstein filed a motion to set aside the verdict
on the basis of newly discovered evidence pursuant to New York
Criminal Procedure Law ("CPL") Section 330.30(3) on April 12, 2005.
In his report, Stuart Allen, the putative expert, claimed that his
enhancement and comparison established "with a high degree of
scientific certainty" that the man shown exiting through Jubilee's

side door following the shooting was not Mr. Gruyair.  (Forensic Examination Report of Stuart Allen ("Forensic Report"), attached as Exh. C to Answer, at 4).

On June 16, 2005 Justice Wetzel denied the petitioner's motion in an oral decision. (Resp. Memo. at 19; 440 Aff., ¶ 36).  First, he found that it failed at the threshold because the new information could have been discovered prior to trial.  (440 Aff., ¶ 36).  Second, in Justice Wetzel's view, the evidence would not have necessarily affected the outcome of the case.  (440 Aff., ¶ 36; 440 Denial at 1-2).

Three years later, on May 28, 2008, Mr. Gruyair brought a motion pursuant to CPL Section 440.10(1)(h) and (f) to vacate the judgment against him. (440 Aff., ¶ 2).  In that motion, his new appellate counsel argued that his conviction had been obtained

> in violation of (1) [his] rights to effective assistance of counsel and due process under the federal and state constitutions, U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, section 6, and (2) [his] right to assistance of counsel in responding to all substantive jury communications under People v. Kisoon, 8 N.Y.3d 129 (2007) and People v. O'Rama, 78 N.Y.2d 270 (1991) and right to presence at the critical stage when the Court elected not to answer a note from the jury.

(440 Aff., ¶ 2).  The petitioner's effective assistance of counsel claim was based on the theory that Mr. Golstein "failed to provide Mr. Gruyair with effective assistance by unreasonably failing to present to the jury a forensic expert's enhancement" of the

10

surveillance footage from Jubilee.  (440 Aff., ¶ 3).

Justice Wetzel denied the motion on December 22, 2008, finding that the petitioner's trial counsel was "unquestionably effective" in the face of "powerful" evidence against his client. (440 Denial at 6).  Moreover, in Justice Wetzel's view, the jury's notes asking for clearer security footage "actually evidence counsel's effectiveness at trial[]" because they took seriously the argument that the footage of the shooter did not depict Mr. Gruyair and debated the point.  (440 Denial at 9). Similarly, Justice Wetzel denied the petitioner's claim with regards to jury communications on two grounds; first, because it could be raised on direct appeal, and, second, because Jury Note IX was not a substantive jury communication. (440 Denial at 10).  On May 19, 2009, the Appellate Division, First Department denied the petitioner's request for leave to appeal the denial of his motion to vacate the judgement. (Certificate Denying Leave, attached as Exh. K to Answer).

In October 2009, the petitioner appealed his conviction to the Appellate Division.  He raised essentially the same arguments as in his 440 motion.  (Brief for Defendant-Appellant, attached as Exh. L to Answer, at 10, 17).  On July 1, 2010, the Appellate Division unanimously affirmed the judgment of conviction.  People v. Gruyair, 75 A.D.3d 401, 401, 904 N.Y.S.2d 48, 48 (1st Dep't)(2010). It held that Jury Note IX was ministerial rather than substantive

in nature and that, therefore, neither the Constitution nor the relevant New York statutes required the judge to notify defense counsel of its existence.  Id. at 402-03, 904 N.Y.S.2d at 49-50. On the issue of whether Justice Wetzel provided a meaningful response to the note, the Appellate Division observed that, "[c]onsistent with the jurors' wishes as expressed in the note . . . the court allowed the jurors to leave the room and the building[] escorted by court officers." Id. at 402, 904 N.Y.S.2d at 50.

On July 30, 2010, the petitioner applied for permission to appeal to the New York Court of Appeals pursuant to CPL Section 460.20.  (Petitioner's Letter Applying for Leave to Appeal dated July 30, 2010 ("Leave Letter"), attached as Exh. O to Answer).  The petitioner's separate letter in support of the application raised only the issue of the trial court's handling of Jury Note IX, not any claim of ineffective assistance of counsel.  (Petitioner's Letter in Support of Application for Permission to Appeal dated Sept. 14, 2010 ("Support Letter"), attached as Exh. O to Answer). Although Mr. Gruyair's appellate attorney framed the issue primarily in terms of whether the Appellate Division abused its discretion by holding that under state law Jury Note IX was ministerial rather than substantive, he also argued that the trial judge's handling of Jury Note IX violated both the petitioner's federal constitutional right to be present at every material stage

12

of trial and his "core right to assistance of counsel" under Art.
I, § 6 of the New York State Constitution.  (Support Letter at 3-
5).  On September 30, 2010, the Court of Appeals denied leave to
appeal. People v. Gruyair, 15 N.Y.3d 852, 909 N.Y.S.2d 29 (2010).

Mr. Gruyair filed this pro se petition for a writ of habeas
corpus on December 8, 2010.

Discussion

A.   Exhaustion and Procedural Default

A petitioner must exhaust all available state court remedies
for each claim prior to seeking federal habeas review.  28 U.S.C.
§ 2254(b)(1)(A).  Exhaustion requires that the factual and legal
basis for each claim be fairly presented to the highest available
state court and that the petitioner utilize "'all available
mechanisms to secure appellate review of the denial of that
claim.'"  Mayen v. Artist, No. 06 Civ. 14261, 2008 WL 2201464, at
*4 (S.D.N.Y. May 23, 2008) (quoting Klein v. Harris, 667 F.2d 274,
282 (2d Cir. 1981)); see also 28 U.S.C. § 2254(c); Galdamez v.
Keane, 394 F.3d 68, 72 (2d Cir. 2005); Torres v. McGrath, 407 F.
Supp. 2d 551, 557 (S.D.N.Y. 2006).  "In order to have fairly
presented his federal claim to the state courts the petitioner must
have informed the state court of both the factual and the legal
premises of the claim he asserts in federal court."  Daye v.
Attorney General of New York, 696 F.2d 186, 191 (2d Cir. 1982) (en

13

banc); <u>accord</u> <u>Jones v. Keane</u>, 329 F.3d 290, 294-95 (2d Cir. 2003).
A petitioner need not cite "book and verse on the federal
constitution" to alert a state court to the nature of a legal
claim.  <u>Picard v. Connor</u>, 404 U.S. 270, 278 (1971) (citation
omitted); <u>accord</u> <u>Jackson v. Edwards</u>, 404 F.3d 612, 619 (2d Cir.
2005); <u>Daye</u>, 696 F.2d at 192.  However, a state court should not
have to guess that a constitutional claim is involved.  <u>Petrucelli
v. Coombe</u>, 735 F.2d 684, 689 (2d Cir. 1984); <u>see also</u> <u>Galdamez</u>, 394
F.3d at 74 (holding that state's highest court need not "look for
a needle in a paper haystack" (quoting <u>Grey v. Hoke</u>, 933 F.2d 117,
120 (2d Cir. 1991)).  To fully exhaust a claim raised on appeal in
New York State, a petitioner must present each relevant claim in
his application to appeal to the New York Court of Appeals.
<u>Ramirez v. Attorney General of the State of New York</u>, 280 F.3d 87,
94 (2d Cir. 2001).

     The petitioner raised both his first and third claims in
constitutional terms in his motion to set aside the verdict, on
direct appeal, and in his request for leave to appeal to the Court
of Appeals.  The respondent concedes that Mr. Gruyair exhausted
these claims.  (Resp. Memo. at 19, 43).

     Mr Gruyair has, however, failed to exhaust his second and
fourth claims.  He presented neither of them in his motion for new
a trial or on direct appeal.  In his motion to set aside the

verdict, the petitioner did assert that Justice Wetzel failed to respond to Jury Note IX, but based his argument solely on state law. (440 Aff.; Memorandum of Law in Support of Petitioner's Motion to Set Aside Verdict ("440 Memo."), attached as Exh. F to Answer)). On direct appeal as well, he based his failure to respond claim only on state law. (Brief for Appellant-Defendant at 17-18). Finally, he did not refer to it at all in his application for leave to appeal to the New York Court of Appeals. (Support Letter).

With regard to effective assistance of counsel, the petitioner only asserted that Mr. Goldstein's failure to obtain expert analysis and enhancement of the security camera footage constituted ineffective assistance in his motion to set aside the verdict; he did not claim that Justice Wetzel's actions rendered his counsel ineffective. (440 Aff.; 440 Memo.). Nor did he raise that claim on direct appeal or in his application for leave to appeal to the New York Court of Appeals. (Brief for Appellant-Defendant at 17-18; Support Letter). Because the petitioner has not given the state courts a full opportunity to resolve these constitutional claims, he has not exhausted them.

Moreover, Mr. Gruyair is now barred from raising either claim in any New York state court. He has had the one direct appeal and the one application for leave to appeal to the Court of Appeals to

15

which he is entitled.  New York Court of Appeals Rule 500.20(a); see Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994); Grey, 933 F.2d at 120.  Similarly, Mr. Gruyair cannot raise his constitutional claims by way of collateral attack because New York law bars collateral review of claims that could have been raised in an application for leave to appeal but were not.  CPL § 440.10(2)(c); see Bossett, 41 F.3d at 829; Grey, 933 F.2d at 120. Because the petitioner cannot now bring his second or fourth claims in any state court, they must be deemed exhausted and procedurally defaulted.  See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); Jones, 329 F.3d at 296 (2d Cir. 2003); Aparicio v. Artuz, 269 F.3d 78, 90-91 (2d Cir. 2001).

Procedurally defaulted claims are precluded from review unless the petitioner can demonstrate either: (1) cause for the default and actual prejudice resulting therefrom; or (2) that the "failure to consider the claim[] will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 748, 750 (1991) (internal citations and quotations omitted); Sweet v. Bennett, 353 F.3d 135, 141 (2d Cir. 2003).  Mr. Gruyair can meet neither standard.

A petitioner demonstrates cause if he can show that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule."  Murray v. Carrier, 477

16

U.S. 478, 488 (1986); accord Coleman, 501 U.S. at 753. Mr. Gruyair has not suggested that any external influence prevented him from complying with state procedures. Since he has failed to show cause, it is not necessary to consider the issue of prejudice. See McCleskey v. Zant, 499 U.S. 467, 502 (1991) (holding that if petitioner is unable to show cause, a court need not consider prejudice).

The petitioner is also unable to show that failure to consider his unexhausted claims will result in a fundamental miscarriage of justice. The Supreme Court has limited this exception to the "extraordinary" case where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995) (quoting Murray, 477 U.S. at 496). Here, the prosecution introduced extensive evidence of Mr. Gruyair's guilt at trial, including identification by two eyewitnesses and security camera footage that shows him leaving Jubilee while apparently tucking a gun into his belt.

B.   Right to be Present During All Material Stages of Trial

The petitioner claims that the trial judge's decision not to alert defense counsel about Jury Note IX violated his right to be present at all material stages of trial. In response, the respondent contends that under the standard established by the Antiterrorism and Effective Death Penalty Act of 1996 (the

"AEDPA"), there is no clearly established precedent that the right to be present at all material stages of trial extends to the receipt of a jury note by the judge. Alternatively, the respondent argues that the petitioner suffered no constitutional violation because his presence would not have contributed to the fairness of his trial. Because the respondent's alternative argument is correct, there is no need to address the first.

A petitioner's right to be present at all stages of his criminal trial is triggered whenever "his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge" and when "a fair and just hearing would be thwarted by his absence." Kentucky v. Stincer, 482 U.S. 730, 745 (1987); Snyder v. Massachusetts, 291 U.S. 97, 105-06, 108 (1934). "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Stincer, 482 U.S. at 745. Here, Jury Note IX's contents were not related to any of the legal or factual issues at trial -- instead, it sought only to clarify what would happen after the verdict was read. Thus the Appellate Division was correct to conclude that the petitioner's presence in connection with Jury Note IX would not have "borne any relation, let alone any reasonably substantial relation, to his opportunity to defend

18

against the charges." Gruyair, 75 A.D.3d at 403, 904 N.Y.S.2d at 50. Because Mr. Gruyair's presence in connection with Jury Note IX would not have improved his opportunity to defend against the charges, this claim should be denied.

### C.   Ineffective Assistance of Counsel

Mr. Gruyair also asserts that he was denied effective assistance of counsel because Mr. Goldstein failed to have Jubilee's security camera footage enhanced and analyzed by an expert prior to trial. A habeas petitioner who asserts ineffective assistance of counsel must show both that (1) his counsel's performance was deficient, and (2) the deficient performance was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); accord Lockhart v. Fretwell, 506 U.S. 364, 369 (1993). In assessing whether an attorney's performance was deficient, a reviewing court must determine whether his conduct "fell below an objective standard of reasonableness," given the facts and circumstances of the particular case. Strickland, 466 U.S. at 688. The court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Although Strickland establishes a two-part test, a court need not necessarily address both prongs. Id. at 697.

Here, the petitioner has failed to show any deficient

performance.   At trial, Mr. Goldstein zealously defended Mr. Gruyair by, among other things, filing a variety of pretrial suppression motions, impeaching Mr. Holmes' testimony on the basis of his history as a violent drug dealer, arguing that the poor quality of the surveillance footage created doubt about the identity of the shooter, and persuading the court to impose a sentence of twelve years, rather than the twenty-five years to life sought by the prosecution.

In an ineffective assistance of counsel claim, "strategic choices made after less than complete investigation are reasonable . . . to the extent that reasonable professional judgments support the limitations on investigation."   Strickland, at 690-91.   Based on my own review, the original footage from Jubilee was sufficiently clear and incriminating that it was reasonable for Mr. Goldstein to conclude that enhancement would likely have undermined the defense case.   Furthermore, the petitioner has not shown that Mr. Goldstein had any reason to believe that enhancement would overcome the "low resolution and . . . significant artifacts, including pixelation, motion[,] and blurring" present in the footage. (Forensic Report at 3).   For both of these reasons, it simply cannot be said that Mr. Goldstein's decision not to obtain enhanced footage prior to trial fell outside the wide range of reasonable professional assistance envisioned by Strickland.

Therefore the petitioner's claim that he received ineffective assistance of counsel should also be denied.

<u>Conclusion</u>

For the reasons set forth above, I recommend that Mr. Gruyair's petition for a writ of habeas corpus be denied.  Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, Room 2510, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       October 3, 2011

Copies mailed this date to:

Alexis Gruyair
05-A-3380
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York  12582

21

Matthew C. Williams, Esq.
Assistant District Attorney
One Hogan Place
New York, New York  10013